## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

GENE WRIGHT, JR. AND                                    CIVIL ACTION
JOSHUA SCURRIA

VERSUS

                                       20-644-SDD-RLB

BOARD OF COMMISSIONERS OF
THE CAPITAL AREA TRANSIT SYSTEM;
AND THE CITY/PARISH
OF EAST BATON ROUGE

### RULING

    This matter is before the Court on the *Motion for Summary Judgment*[1] filed by Plaintiffs, Gene Wright, Jr., ("Wright") and Joshua Scurria ("Scurria")(or collectively, "Plaintiffs").   Defendant, Board of Commissioners of the Capital Area Transit System ("CATS") filed an untimely *Opposition*[2] to this motion, to which Plaintiffs filed a *Reply*.[3] On November 8, 2022, the Court entered an *Order* granting Plaintiffs' *Motion* as to liability and entitlement to injunctive relief "for written reasons to be assigned."[4]  These reasons are provided below.

## I.    PROCEDURAL BACKGROUND

    On September 29, 2020, Plaintiff Wright, a qualified individual with a disability who

---

[1] Rec. Doc. 64.
[2] Rec. Doc. 76.
[3] Rec. Doc. 80.
[4] Rec. Doc. 87.

is confined to a wheelchair, filed a *Complaint*[5] against CATS and the City/Parish of East Baton Rouge under Title II of the Americans with Disabilities Act ("ADA")[6] and the Rehabilitation Act of 1973 ("RA").[7] On November 24, 2020, CATS filed a *Motion to Dismiss* pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[8] The City/Parish filed its own *Motion to Dismiss* on December 3, 2020.[9]  On December 14, 2020, Wright responded to the motions by filing an *Amended Complaint*,[10] wherein Wright alleged that CATS and the City/Parish violated the ADA and the RA by providing inadequate transportation services and by failing to provide bus stops that are accessible to persons with mobility-related disabilities.[11] Wright claimed that CATS and the City/Parish refused to rectify barriers to access including (1) non-existent bus landing pads, (2) cracked, broken, uneven, and excessively steep bus stop landing pads, and (3) lack of accessible routes to bus stop landing pads.[12]

On December 28, 2020, the City/Parish filed a *Motion to Dismiss* for Failure to State a Claim.[13] CATS also filed a *Motion to Dismiss* Pursuant to FRCP Rule 12(b)(6) on January 12, 2021.[14] These motions were decided together on July 29, 2021.[15] The Court granted the City/Parish's *Motion*, finding that Wright had only asserted claims against the City/Parish "to the extent it owns and/or is legally responsible for the segment of the

---

[5] Rec. Doc. 1.
[6]  42 U.S.C. § 12131 *et seq*.
[7]  29 U.S.C. § 794 *et seq*.
[8] Rec. Doc. 10.
[9] Rec. Doc. 13.
[10] Rec. Doc. 14.
[11] *Id.* at p. 2.
[12] *Id.* at pp. 6-7.
[13] Rec. Doc. 20.
[14] Rec. Doc. 22.
[15] Rec. Doc. 41.

landing pad that overlaps with the public sidewalk."[16] The Court considered the Operating Agreement executed between the City/Parish and CATS, which set forth, in length, the rights and duties of each entity regarding public transportation services in Baton Rouge.[17] The Operating Agreement provided that The City/Parish transferred its interest in bus stops and shelters to CATS while still retaining title to the land on which they are located.[18] The Court found no allegations in Wright's *Amended Complaint* that the land, sidewalks, or public rights-of-way were not ADA compliant outside of the issue of the landing pads.[19] The Court characterized Wright's allegations of joint liability between CATS and the City/Parish with regard to ADA compliance and the City/Parish's liability for CATS's conduct when installing bus stops and operating a transit system as legal conclusions.[20] Furthermore, the Court noted that Wright argued that "the extent of City/Parish's legal obligation with regard to bus stops is far from clear,"[21] and determined this allegation was unsupported by fact and insufficient to withstand a motion to dismiss.[22] The Court agreed with the City/Parish's argument that it was not responsible as a matter of law for the maintenance and ADA compliance of public transport bus stops and that CATS was the sole entity charged with that duty.[23] Thus, Wright's claims against the City/Parish were dismissed with prejudice.[24]

In its *Motion*,[25] CATS argued that: (1) CATS does not own or control city sidewalks

---

[16] Rec. Doc. 14, p. 5.
[17] Rec. Doc. 41, p. 6.
[18] Rec. Doc. 20-3, p. 4.
[19] Rec. Doc. 41, p. 12.
[20] *Id.* at pp. 11-12.
[21] Rec. Doc. 23, p. 9.
[22] Rec. Doc. 41, pp. 13-14.
[23] *Id.* at p. 13.
[24] *Id.* at p. 15.
[25] Rec. Doc. 22.

or bus benches;[26] (2) bus stops with a pole in the ground and the addition of benches to bus stops are not new constructions or alterations requiring ADA compliance;[27] and (3) Wright's disability is accommodated by the availability of paratransit service.[28] In its *Ruling*, the Court agreed that CATS did not own or control sidewalks or bench placements but found that argument irrelevant because state law and the Operating Agreement provided that CATS had the duties of construction and maintenance of bus stops.[29] The Court found the arguments relating to new constructions and alterations under the ADA were questions of fact and mixed law and fact; thus, they were not properly before the Court in a Rule 12(b)(6) motion.[30] The Court was also unpersuaded by CATS's argument that the availability of paratransit obviates its obligation to maintain accessible bus stops, finding that Wright alleged sufficient factual differences in the types of services to put CATS on notice and survive a motion to dismiss.[31]

Following the dismissal of the City/Parish as a party, Wright filed a *Second Amended Complaint* on September 14, 2021, which added Joshua Scurria as co-plaintiff and removed the claims against the City/Parish.[32] CATS's answer to Plaintiffs' *Second Amended Complaint* was due fourteen (14) days after service of the amended pleading,[33] on September 28, 2021. This deadline was extended by thirty days due to Hurricane Ida for a new deadline of October 28, 2021.[34] When no answer or responsive pleading was filed by that deadline, Plaintiffs filed a *Motion for Entry of Default* pursuant to Rule 55(a)

---

[26] Rec. Doc. 22-1, p. 8.
[27] *Id.* at pp. 9-11.
[28] *Id.* at pp. 13-15.
[29] Rec. Doc. 41, p. 15.
[30] *Id.* at pp. 15-16.
[31] *Id.* at pp. 16-17.
[32] Rec. Doc. 45.
[33] Fed. R. Civ. P. 15(a)(3).
[34] Rec. Doc. 47, p. 2.

4

of the Federal Rules of Civil Procedure.[35] This *Motion* was denied because CATS filed responsive pleadings on November 24, 2020 and on January 12th, 2021.[36] CATS then filed an *Answer* to the *Second Amended Complaint* on November 18, 2021.[37]

Plaintiffs filed the pending *Motion for Summary Judgment* on June 8, 2022.[38] CATS filed a *Motion for Extension of Time to File Response* on June 28, 2022,[39] which was granted,[40] and CATS filed a *Second Motion for Extension of Time to File Response* on August 2, 2022.[41] That motion was denied,[42] and CATS filed an untimely *Memorandum in Opposition* to Plaintiffs' *Motion for Summary Judgment* on August 25, 2022.[43]

CATS also filed a *Motion for Leave to File Complaint for Interpleader* on September 6, 2022, seeking to re-join the City/Parish as a defendant in the matter.[44] Because the City/Parish had already been dismissed with prejudice, and because CATS did not allege that it would be subject to any double or multiple liability if the City/Parish was not joined in the action, the Magistrate Judge interpreted that the motion was subject to impleader under Rule 14 and not interpleader under Rule 22.[45] The Court determined the motion was untimely because the City/Parish had been dismissed from the action on July 29,

---

[35] Rec. Doc. 47.
[36] Rec. Doc. 48.
[37] Rec. Doc. 49.    Subsequently, on December 8, 2021, the Court granted Plaintiffs' *Motion to Compel Discovery*. Rec. Doc. 50. Plaintiffs filed a *Motion for Contempt and Enforcement of Court Order* on December 20, 2021, requesting that the Court: (1) require CATS to answer the written discovery within seven days as previously ordered; (2) hold CATS in contempt of the previous Order compelling discovery; (3) award attorneys' fees associated incurred by Plaintiffs in bringing the *Motion for Contempt/Motion to Amend Deadlines*; and (4) warn a non-attorney representative of CATS that any further violations will result in striking Defendant's *Answer* and entering default judgment.  Rec. Doc. 51, p. 1.
[38] Rec. Doc. 64.
[39] Rec. Doc. 65.
[40] Rec. Doc. 66.
[41] Rec. Doc. 69.
[42] Rec. Doc. 75.
[43] Rec. Doc. 76.
[44] Rec. Doc. 83.
[45] Rec. Doc. 85, p. 4.

2021, and the deadline for CATS to join additional parties expired on August 23, 2021.[46]
The Court further held that, if CATS sought modification of the Court's deadlines to name
a new party, that relief should be denied for failure to demonstrate good cause under Rule
16(b)(4) of the Federal Rules of Civil Procedure.[47]

## II.    CHALLENGED DOCUMENTS

Plaintiffs argue in their *Reply* that CATS has attached to its *Opposition* as summary
judgment evidence eleven previously unproduced exhibits and declarations by previously
undisclosed witnesses.[48]  Plaintiffs contend CATS never produced initial disclosures or
complied with a Court's order to compel same,[49] resulting in an order of contempt.[50]  And,
although CATS eventually responded to Plaintiffs' discovery, Plaintiffs note that these
unproduced exhibits are responsive to their prior requests for production; yet, Plaintiffs
saw these documents for the first time when filed as exhibits to CATS's *Opposition*.[51]  As
for the two witness declarations submitted by CATS, Plaintiffs demonstrate that these
declarants, Jonathan Charbonnet and Brandon Songy, are new and previously
undisclosed witnesses.[52]  Understandably, Plaintiffs urge the Court to exclude these
exhibits from consideration in deciding the pending summary judgment motion.

Plaintiffs filed their *Reply* identifying these unproduced and undisclosed exhibits
and witnesses on September 1, 2022.  As of the date the Court text granted Plaintiffs'
*Motion for Summary Judgment*,[53] November 8, 2022, CATS had not requested leave of

---

[46] *Id.* at pp. 4-5.
[47] *Id.* at p. 5.
[48] Rec. Doc. 80, pp. 2-3 (identifying CATS's Exhibits A, C, D, E, F, G, H, I, J, L, and N; declarations of undisclosed witnesses are Exhibits B and K).
[49] Rec. Doc. 50.
[50] Rec. Doc. 57.
[51] Rec. Doc. 80, p. 3 (citing Plaintiffs' Exhibit Q, pp. 5-7).
[52] *Id.* (citing Rec. Doc. Nos. 79-2 and 79-11).
[53] Rec. Doc. 87.

Court to respond to Plaintiffs' challenges to these documents/witnesses, and CATS had

failed to coordinate its inserts with Plaintiffs for the filing of the *Final Pre-Trial Order*,[54]

also due on November 8, 2022.  In supporting its grant of Plaintiffs' *Motion for Summary*

*Judgment*, the Court makes clear that it has excluded these exhibits pursuant to Rules

26 and 37 of the Federal Rules of Civil Procedure.

## III.    FACTUAL BACKGROUND

Local Rule 56(f) provides:

Facts contained in a supporting or opposing statement of material facts, if
supported by record citations as required by this rule, shall be deemed
admitted unless properly controverted. **An assertion of fact set forth in a
statement of material facts shall be followed by a citation to the
specific page or paragraph of identified record material supporting the
assertion**. The court may disregard any statement of fact not supported by
a specific citation to record material properly considered on summary
judgment. **The court shall have no independent duty to search or
consider any part of the record not specifically referenced in the
parties' separate statement of facts**. (emphasis added).

Local Rule 56 (c) requires an opposing party to:

submit with its opposition a separate, short, and concise statement of
material facts. **The opposing statement shall admit, deny or qualify the
facts by reference to each numbered paragraph of the moving party's
statement of material facts and unless a fact is admitted, shall support
each denial or qualification by a record citation as required by this
rule**. Each such statement shall begin with the designation "Admitted,"
"Denied," or "Qualified" and, in the case of an admission, shall end with such
designation. The opposing statement may contain in a separately titled
section additional facts, each set forth in a separately numbered paragraph
and supported by a record citation as required by subsection (f) of this rule.

The facts set forth below are facts deemed admitted for purposes of this *Motion*

based on CATS's failure to comply with Local Rules 56(c) & (f) of the Middle District of

Louisiana.

---

[54] Rec. Doc. 88.

Plaintiff Wright lives in Baton Rouge, Louisiana.[55]  In 2011, Wright was in an automobile crash that left him with a spinal cord injury and the loss of his right leg.[56] Wright is a C-4 quadriplegic who cannot stand or walk without the use of a wheelchair.[57] Although Wright routinely used the public bus system prior to his 2011 accident, he became aware of the lack of safe landing pads at bus stops after he became wheelchair-bound.[58]  Wright claims bus stops without landing pads are dangerous because, at such stops, Wright is "forced to roll in the grass, dirt and/or mud," which causes him to fear he will lose traction on his wheelchair, fall, and injure himself.[59]

Wright currently uses CATS public buses in Baton Rouge about twice a week; each time he boards the bus without a landing pad, he fears he will fall and sustain injuries.[60] Wright claims that all bus stops closest to his home lack landing pads and instead have only "a pole stuck in the grass."[61] Wright attests that he would leave his house and use CATS buses more often if the bus stops had safe landing pads.[62] Wright sometimes uses CATS's Paratransit, and he believes Paratransit is valuable; however, he often uses the fixed-route buses because Paratransit requires a 24-hour advance reservation and does not allow a same-day reservation.[63]  Since the filing of this lawsuit, Wright has used CATS Paratransit and the public buses in Baton Rouge and intends to continue using both services, despite his aforementioned fears of injury.[64]

---

[55] Rec. Doc. 64-3, ¶ 3.
[56] *Id.* at ¶¶ 4-5.
[57] *Id.* at ¶¶ 4, 6.
[58] *Id.* at ¶¶ 7-8.
[59] *Id.* at ¶ 9.
[60] *Id.* at ¶¶ 10-11.
[61] *Id.* at ¶ 12.
[62] *Id.* at ¶ 13.
[63] *Id.* at ¶¶ 14-15.
[64] *Id.* at ¶¶ 21.

In May 2020, Wright sought a reasonable accommodation from the City of Baton Rouge explaining the lack of landing pads at CATS bus stops and requesting that landing pads be installed.[65]  The City of Baton Rouge acknowledged receipt of this letter request and forwarded it to CATS.[66] On July 13, 2020, Wright filled out a complaint on the CATS website, explaining the lack of landing pads and requesting that landing pads be installed (the "Wright Online Request.").[67]  The Wright Online Request went to Pearlina Thomas ("Thomas"), CATS's then-Chief Administration Officer ("CAO"), who forwarded it to CATS's Karen Denman ("Denman") and Chief Operating Officer ("COO") Dwana Williams ("Williams").[68]  No one from CATS ever responded to Wright's request.[69]

Plaintiff Scurria also lives in Baton Rouge and is a student at Louisiana State University ("LSU").[70]  Scurria suffers from spinal muscular atrophy, which renders him unable to stand or walk without the use of a three hundred fifty (350 lb.) pound motorized wheelchair.[71]  Scurria became aware of the lack of landing pads at Baton Rouge bus stops when he moved here to attend LSU.[72]  Scurria has never used the fixed route bus system because he is afraid of tipping over in his motorized wheelchair, and he is not willing to risk his safety to ride the bus.[73]  However, Scurria attests that he would utilize the Baton Rouge bus system if there were landing pads at the bus stops.[74]

---

[65] *Id.* at ¶ 16.
[66] Rec. Doc. 4.
[67] Rec. Doc. 64-3, ¶ 17; Rec. Doc. 64-5.
[68] Rec. Doc. 64-6, Thomas Depo. at 34:9-17; 35:6-20.
[69] Rec. Doc. 64-3, ¶ 19.
[70] Rec. Doc. 64-7, ¶ 2.
[71] *Id.* at ¶¶ 3-4.
[72] *Id.* at ¶ 5.
[73] *Id.* at ¶¶ 6-7.
[74] *Id.* at ¶ 8.

Like Wright, Scurria reviewed and approved a letter sent to Karen Denman, CATS's ADA Manager (CATS's attorney was copied) wherein it was explained that the bus stop system is inaccessible because most of the bus stops are non-compliant, and accommodations were requested.[75] No one from CATS ever responded to Scurria's letter.[76]

In connection with this lawsuit, Plaintiffs engaged the assistance of Nicholas Heybeck, P.E. ("Heybeck"), offered as an expert in this case in the fields of engineering and the ADA.[77] Heybeck inspected two hundred sixty-nine (269) of CATS's bus stops in Baton Rouge.[78] Heybeck also inspected the length of the ramp on the bus. As explained in his report, "…the observed bus ramp extends 48 [inches] from the outside edge of the bus wheel. Therefore, to ensure the ramp can reach an adjacent bus boarding and alighting it should be situated a maximum of 48 [inches] from a vertical curb edge."[79]

Heybeck inspected the bus stops that represented the system as a whole, such as those in residential and commercial areas, and he also chose bus lines near the Plaintiffs' respective homes and a line that was constructed after the passage of the amended ADA.[80] Heybeck inspected nearly every bus stop on Route 15 (by Wright's home), Route 47 (by Scurria's home), Route 12, and Route 8 (a "newly constructed" bus route).[81] Heybeck recorded measurements of the bus stops and their components to identify property conditions that do not meet the technical specifications published by the

---

[75] *Id.* at ¶ 9; Rec. Doc. 64-8.
[76] *Id.* at ¶ 10.
[77] *See* Rec. Docs. 64-9 & 64-10.
[78] Rec. Doc. 64-9, Heybeck Report, ¶ 2; Rec. Doc. 64-10.
[79] *Id.*, Heybeck Report, ¶ 33.
[80] *Id.* at ¶ 8.
[81] *Id.* at ¶¶ 8-9.

Department of Transportation ("DOT").[82]  In his expert report, Heybeck opined:

> After inspecting and taking measurements of the CATS's bus stops, **it is my opinion that 234 of the 269 or 87% of the bus stops inspected do not meet the technical specifications set forth by the USDOT and Federal Highway Authority.** It is my further opinion that the bus stops contain a number of barriers that deviate significantly from what the ADA proscribes, as evidenced by "Exhibit B". Based on the high percentage of non-compliance observed, it is my opinion that the bus stop program, when viewed in its entirety does not meet the design and scoping standards of the ADA."[83]

Exhibits to Heybeck's report include photos and measurements of the 269 bus stops surveyed.[84]

The bus stops deemed noncompliant have no boarding area whatsoever, have boarding areas that cannot be physically reached by the 48" long bus ramps, boarding areas that were not the required minimum 60" by 96" dimensions, or contained a slope that exceeded the maximum required 2.1% in all directions.[85]  Of the two hundred thirty-four (234) stops found noncompliant, ninety-two (92) stops are nothing more than patches of grass/dirt with a pole indicating that it is a bus stop, without any adjacent landing pad or nearby sidewalk.[86]

CATS has offered no evidence that its bus stops are ADA accessible or any evidence that controverts Heybeck's findings and conclusions. CATS did not offer any countervailing expert report.[87]  As can be seen by comparing the 2012 map of CATS Bus

---

[82] *Id.* at ¶ 8.
[83] *Id.* at ¶ 31 (emphasis original).
[84] Rec. Doc. 64-11.
[85] *Id.*
[86] *Id.* at Violations Table item numbers 6, 8, 12, 13, 15-20, 22-23, 27-42, 44-45, 48, 50, 53, 54, 57, 58, 60, 62, 64-70, 73, 80, 99, 128, 140, 143, 150-151, 153, 155-161, 163-165, 167-168, 170, 172-175, 180, 183, 192, 223-226, 242-243, 259, 261, 263-272.
[87] Rec. Dec. 64-18.

Routes (the "2012 Map")[88] with the current map of CATS Bus Routes (the "2022 Map")[89]

Route #8 did not exist in 2012.  Thus, it was constructed after 2012, long after the passage

of the amended ADA.  According to Heybeck's violations table, there are numerous ADA

violations along Route #8; in fact, thirty-nine bus stops on this route were found to be

noncompliant: Bus Stop ID #s 71; 73; 74; 76; 77; 79; 80-83; 85; 87; 90-93; 95-97; 99-102;

104-112; 114-118; 245; and 246.[90]

CATS's knowledge of these ADA violations is established by the summary

judgment evidence submitted in this case. Thomas, CATS's ex-CAO, agreed that "the

vast majority of the bus stops in Baton Rouge lack landing pads."[91] Williams, CATS's

COO, also confirmed that many of the bus stops in Baton Rouge do not have landing

pads.[92]  Additionally, Plaintiffs demonstrate that CATS had knowledge of the lack of

landing pads at bus stops as the issue was addressed in Plaintiffs' reasonable

accommodation requests.[93]  During the course of this litigation, Plaintiffs sent CATS

Requests for Admission which included, "Please admit that one or more of Your Bus

Stops are not in compliance with the ADA Accessibility Guidelines."[94]  CATS responded:

"CATS recognizes that some bus stops are not ADA compliant but because of the need

to get the fleet up to standards…"[95]

Despite this knowledge, CATS has taken no efforts to remedy the noncompliance.

Williams was unfamiliar with any type of review process to determine whether the bus

---

[88] Rec. Docs. 64-12 & 64-13.
[89] Rec. Doc. 64-14.
[90] Rec. Doc. 64-11, Violations Table.
[91] Rec. Doc. 64-6, Thomas Depo. at 41:3-10.
[92] Rec. Doc. 64-15, Williams Depo. at 15:13-17.
[93] *See* Rec. Docs. 64-36, 64-5,
[94] Rec. Doc. 64-13.
[95] *Id.* (ellipses in original).

stops were ADA compliant.[96]  Denman has never dealt with the issue of whether the bus stops have landing pads,[97] nor has she been tasked with investigating the physical bus stops, benches, or shelters for ADA compliance, before or after the filing of this lawsuit.[98] Similarly, Thomas testified that the landing pads at the bus stops never came up, and she never had any instruction from CATS's Chief Executive Offier ("CEO") Bill DeVille or the Board to determine whether the bus stops were ADA compliant.[99]  During Williams's deposition, she was shown photographs of a bus stop without landing pad, and she was asked where the bus driver would be able to drop off a wheelchair-bound user.  Williams responded that a wheelchair-bound user could not be dropped off at the bus stop shown but would need to be dropped off "at the next safest stop, not in the grass."[100]

Denman testified that Paratransit is the system of ADA compliant busses for individuals with disabilities who may not be able to use the fixed route bus system due to physical limitations.[101]  To qualify for Paratransit, riders must submit an application that must be completed by a doctor.[102]  Denman confirmed that a reservation is required to ride Paratransit and cannot be made on the same day as pickup.[103]  A Paratransit reservation must be made at least one day in advance but not more than fourteen days in advance, and reservations are not always available at requested pickup times.[104] Additionally, Paratransit riders must be ready for pickup ten minutes prior to the scheduled

---

[96] Rec. Doc. 64-15, Williams Depo. at 35:24-2.
[97] Rec. Doc. 64-16, Denman Depo. at 19:12-20:2.
[98] *Id.* at 20:6-21.
[99] Rec. Doc. 64-6, Thomas Depo. at 28:1-6; 31:2-6.
[100] Rec. Doc. 64-15, Williams Depo. at 20:12-17.
[101] Rec. Doc. 64-16, Denman Depo. at 24:10-25:11.
[102] *Id.* at 25:12-26:4.
[103] *Id.* at 29:4-7; 35:4-6.
[104] *Id.* at 29:22-24; 29:8-11; 31:6-19.

time.[105]  If a rider is not at the designated stop at pickup time, the Paratransit driver is instructed to wait for five minutes.[106]  If a rider has too many no-shows or late cancellations, Paratransit privileges may be lost; Denman testified that it is not uncommon for a rider to have Paratransit privileges suspended for no-shows.[107]

As set forth above, CATS repeatedly failed to timely respond to Plaintiffs' Requests for Admissions, resulting in CATS being held in contempt.[108]  Thus, Plaintiffs maintain that CATS has conceded the following: (1) Plaintiffs are qualified individuals with a disability under the ADA and RA; (2) it committed intentional discrimination against both Wright and Scurria; (3) it failed to provide Plaintiffs a reasonable modification under the ADA and RA; (4) it failed to provide Plaintiffs with program access under Title II of the ADA; (5) Plaintiffs experienced disability discrimination that was solely caused by CATS; (6) the bus stop located at 6601 Greenwell Street was modified due to the installation of a bus bench and new signage; (7) it has taken no steps to bring [CATS's] Bus Stops into compliance with the requirements of the ADA and the RA; (8) it has taken no steps to comply with 49 C.F.R. § 37.43; (9) Paratransit service is not equivalent to fixed route bus service in the hours of operation, timeliness, or ability to engage in spur-of-the-moment travel; and (10) bringing the bus stops into compliance with the ADA Accessibility Guidelines would not constitute an undue burden or be technically infeasible.[109]

Denman testified that she is CATS's ADA Manager and, with one assistant, she exclusively works with Paratransit.[110]  Besides Denman and this assistant, no one at

---

[105] *Id.* at 32:12-13.
[106] *Id.* at 34-2-6.
[107] *Id.* at 36:7-25; 40:23-41:8.
[108] *See* Rec. Docs. 64-13, 64-17, 64-18, & 57, p. 7.
[109] Rec. Doc. 64-2, ¶ 72 (citing Rec. Doc. 64-13).
[110] Rec. Doc. 64-16, Denman Depo. at 7:3-4.

CATS deals with the ADA.[111]  Denman could not recall if she has ever fielded a complaint or reasonable accommodation request from a disabled person that did not involve Paratransit.[112]  Williams confirmed the lack of an ADA Coordinator at CATS[113] and admitted that Denman is the only person at CATS handling ADA matters.[114]  Previous CATS CAO Thomas testified that CATS receives federal funds from the Federal Transit Administration.[115]

In response to Requests for Admission No. 11, CATS "vehemently" denied that it would be an undue burden or technically infeasible to bring the Baton Rouge bus stops into ADA compliance; however, CATS stated it "is uncertain if CATS would have the financial capability to undertake such a project. CATS is also unsure of which entity is responsible for ADA Accessibility on infrastructure along side [sic] City-Parish or State owned roadways."[116]

Based on the foregoing undisputed facts, Plaintiffs move for summary judgment. The Court turns to the Parties' arguments.

## IV.   LAW & ANALYSIS

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[117] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing

---

[111] *Id.*
[112] *Id.* at 21:18-22; 23:2-6.
[113] Rec. Doc. 64-15, Williams Depo. at 6:11-15.
[114] *Id.* at 15:23-16:4; 16:5-16.
[115] Rec. Doc. 64-6, Thomas Depo. at 43:12-44:20.
[116] Rec. Doc. 64-13.
[117] Fed. R. Civ. P. 56(a).

the evidence."[118] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[119] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[120] However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[121]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[122]  All reasonable factual inferences are drawn in favor of the nonmoving party.[123]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[124]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[125] Unless there is sufficient evidence for a jury to return a verdict

---

[118] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008).

[119] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25).

[120] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[121] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).

[122] *Pylant v. Hartford Life and Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[123] *Galindo v. Precision Am. Corp*., 754 F.2d 1212, 1216 (5th Cir. 1985).

[124] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

[125] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).

in the nonmovant's favor, there is no genuine issue for trial.[126]

### B. Public Facilities/ Services and the ADA

The ADA "is a broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life."[127] "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)."[128]  "Title II of the ADA focuses on disability discrimination in the provision of public services."[129]  Specifically, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[130] A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."[131]

Similarly, "Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding."[132]  Section 504 provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or

---

[126] *Anderson*, 477 U.S. at 249-251.
[127] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011)(en banc)(citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (internal quotation marks omitted)).
[128] *PGA Tour*, 532 U.S. at 675, 121 S.Ct. 1879.
[129] *Frame*, 657 F.3d at 223.
[130] 42 U.S.C. § 12132.
[131] *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (quoting 42 U.S.C. § 12131(1)(B)).
[132] *Frame*, 657 F.3d at 223.

activity receiving Federal financial assistance."[133] The ADA and the Rehabilitation Act are generally interpreted *in pari materia*.[134] "Indeed, Congress has instructed courts that 'nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V [i.e., § 504] of the Rehabilitation Act ... or the regulations issued by Federal agencies pursuant to such title.'"[135]

"To show a violation of either statute, a plaintiff must prove "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability."[136] Further, in an ADA/RA claim where a plaintiff seeks injunctive relief, as is the case here, the plaintiff need not establish that the discrimination was intentional.[137] The Fifth Circuit held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA and the RA.[138]

Pursuant to his authority, the United States Attorney General has promulgated regulations implementing Title II.[139] These regulations provide that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable

---

[133] 29 U.S.C. § 794(a).

[134] *Frame*, 657 F.3d at 223 (citing *Kemp v. Holder*, 610 F.3d 231, 234–35 (5th Cir. 2010); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287–88, 289 n. 76 (5th Cir. 2005) (en banc)).

[135] *Id.* at 223–24 (quoting 42 U.S.C. § 12201(a); *Bragdon v. Abbott*, 524 U.S. 624, 632, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)).

[136] *Miraglia v. Bd. of Supervisors of La. St. Museum*, 901 F.3d 565, 574 (5th Cir. 2018) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam)).

[137] *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 fn. 8 (11th Cir. 2014) ("Where a plaintiff is not seeking compensatory damages, discriminatory intent is not required.").

[138] *See, e.g., Melton v. Dall. Area Rapid Transit*, 391 F.3d 669 (5th Cir. 2004); *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014).

[139] 42 U.S.C. § 12134(a).

by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."[140] A public entity is required to operate "each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[141] Thus, Title II requires "program accessibility."[142]

"Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility."[143] However, a public entity is not "necessarily require[d] ... to make each of its existing facilities accessible to and usable by individuals with disabilities."[144] Rather, as to facilities built before 1992, Title II only requires "'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service."[145]

"In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards,"[146] including the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG") set forth at 36 C.F.R. part 1191, appendices B and D. Pursuant to the regulations, "[e]ach facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility ... shall, to the maximum extent feasible, be altered in

---

[140] 28 C.F.R. § 35.149.
[141] *Id.* at § 35.150(a).
[142] *Tennessee v. Lane*, 541 U.S. 509, 531, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004).
[143] *Id.* (citing 42 U.S.C. § 12131(2)).
[144] 28 C.F.R. § 35.150(a)(1).
[145] *Lane*, 541 U.S. at 531, 124 S.Ct. 1978.
[146] *Id.* (citing 28 CFR § 35.151).

such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities...."[147]

### C. Parties' Arguments

Plaintiffs argue three different theories of liability. First, Plaintiffs claim CATS failed to provide Plaintiffs with "program access" as required under the ADA because 84% of the bus stops investigated by Plaintiffs' expert violated the ADA.[148] Second, Plaintiffs contend CATS failed to comply with the new construction requirement with respect to their newly constructed bus stops.[149] Finally, Plaintiffs argue CATS failed to provide Plaintiffs with a reasonable modification because they ignored Plaintiffs' requests.[150]

Just like it failed to counter Plaintiffs' statement of undisputed facts, CATS fails to specifically respond to the substance of any of Plaintiffs' legal arguments. Rather, CATS contends that the MovEBR Program provides a comprehensive remedy for Plaintiffs' claims, rendering this case moot.[151] Alternatively, CATS argues that the MovEBR Program defeats Plaintiffs' standing to bring this action.[152] CATS reiterates the argument that the City/Parish of Baton Rouge maintains ownership of the land on which CATS bus stops are located, and placement of the landing pads will "require alteration of the ground belonging to City/Parish during the progression of MovEBR projects" which will ultimately remedy the conditions forming the basis of Plaintiffs' claims.[153] CATS argues that one of the stated goals of the MovEBR projects is providing and improving ADA compliance and

---

[147] 28 C.F.R. § 35.151(b)(1).
[148] Rec. Doc. 64-1, p. 2.
[149] *Id.*
[150] *Id.*
[151] Rec. Doc. 76, p. 1.
[152] *Id.*
[153] *Id.*

access.[154] CATS asks the Court to consider the standards for the seventy (70) MovEBR projects, which require sidewalks on all projects to be compliant with the Public Rights-of-Way Accessibility Guidelines (PROWAG), in order to ensure ADA compliance.[155]

CATS also argues that full compliance with an adverse summary judgment ruling is impossible.[156] CATS maintains that the landing pads at issue are not simply movable property affixed to the land on which the bus stops are located but, rather, integrated with the immovable property such that alteration would require permission and participation from the City/Parish of Baton Rouge.[157] CATS claims the City/Parish's full control of the MovEBR program necessitates its involvement.[158]

      1.  <u>Program Accessibility</u>

Plaintiff's first theory of liability concerns CATS's failure to provide program access to bus stops.[159] "Program accessibility" under Title II of the ADA requires public entities to make their programs accessible. Physical changes to a building are required only when there is no other feasible way to make the program accessible. When determining if a public entity has discriminated against a disabled individual, Title II of the ADA differentiates between 'existing structures,' (structures built prior January 1992) and facilities built or altered after January 1992.[160] For programs that take place in existing facilities, the public entity must "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and

---

[154] *Id.* at p. 5.
[155] *Id.*
[156] *Id.* at pp. 8-9.
[157] *Id.* at p. 9.
[158] *Id.*
[159] Rec. Doc. 64-1, p. 13.
[160] *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 291 (5th Cir. 2012).

usable by individuals with disabilities."[161] Program accessibility does not require public entities to make each and every facility accessible.[162] Rather, "[a] public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance," such as "delivery of services at alternate accessible sites" and "construction of new facilities."[163] "Title II's emphasis on program accessibility' rather than 'facilities accessibility' is meant to ensure public entities provide broad access to public services, while maintaining flexibility for these entities to choose how best to make access available."[164]

Program accessibility is ultimately a subjective determination that considers the program or activity at issue rather than evaluating individual elements of the facility where the program is held.[165] Unfortunately, the ADA regulations do not provide any objective criteria for evaluating program accessibility.[166] However, at least one federal district court has interpreted the program accessibility requirement in the context of public transportation. In *Falls v. Bd. of Commissioners of New Orleans Reg'l Transit Auth.*, the district court for the Eastern District of Louisiana considered a case wherein the plaintiffs alleged that nearly 94.3% of all bus stops were non-compliant with ADA requirements; the *Falls* court found that the defendants had discriminated against those plaintiffs as to existing bus stops.[167]

---

[161] 28 C.F.R. § 35.150.
[162] 28 C.F.R. § 35.150(a)(1); this standard does not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities."
[163] 28 C.F.R. § 35.150(b).
[164] *Belinski v. City of San Bernardino*, No. CV088571PSGMANX, 2010 WL 11596645, at *5 (C.D. Cal. Jan. 27, 2010)(quoting *Parker v. Universidad de P.R.*, 225 F.3d 1, 6 (1st Cir. 2000)).
[165] *Greer*, 472 F. App'x at 291–92.
[166] *Id.* at 291.
[167] *Falls v. Bd. of Commissioners of New Orleans Reg'l Transit Auth.*, No. CV 16-2499, 2017 WL 2730781, at *4 (E.D. La. June 26, 2017).

In the present case, Plaintiffs' expert Heybeck inspected and took measurements of the CATS's bus stops and concluded that 234 of the 270 (87%) bus stops inspected did not meet the technical specifications set forth by the USDOT and Federal Highway Authority.[168] Based on these findings, Heybeck opined that CATS's bus stop program, when viewed in its entirety, does not meet the design and scoping standards of the ADA.[169] Although the percentage of inadequately accessible bus stops here is a bit lower (87% compared to 94.3%) than that in *Falls*, Plaintiffs have demonstrated that, viewed as a whole, the CATS bus system is largely inaccessible to disabled individuals using a mobility assistance device.  Heybeck's investigation, calculations, and conclusions are unchallenged and uncontroverted by CATS.  Based on the law, the summary judgment evidence in the record, and the utter lack of countervailing evidence by CATS, the Court finds that there is no genuine issue of material fact in dispute as to whether CATS has failed to provide program access to bus stops in Baton Rouge, which is solely CATS's responsibility under Louisiana law and the Operating Agreement.[170]  Plaintiffs are entitled to summary judgment on this claim.

### 2.  New Constructions

Plaintiffs' second theory of liability hinges on the allegations of "new" constructions. Under the ADA, facilities which are constructed or modified after January 1992 are not held to the program accessibility standard but rather the Americans with Disabilities Act Accessibility Guidelines (ADAAG).[171] New ADAAG standards were republished in 2010 requiring that construction and alterations on or after March 15, 2012 meet the new

---

[168] Rec. Doc. 64-9, p. 10.
[169] *Id.*
[170] *See* Rec. Doc. 41.
[171] 28 C.F.R. § 36.402.

standards.[172]

Plaintiffs claim CATS has constructed new bus stops without landing pads. Specifically, Plaintiffs showed that CATS Bus Route #8 was constructed after 2012.[173] Plaintiffs offered the 2012 Map of CATS Bus Routes[174] and the current 2022 Map for comparison.[175]  Bus Route #8 appears to cover areas such as Monterrey Boulevard and Greenwell Springs Road that were not previously serviced by any route, supporting a finding that those bus stops were constructed after the promulgation of the 2012 Map.

ADA regulations require new constructions (facilities designed and constructed for first occupancy after January 26, 1993) to be readily accessible to and usable by individuals with disabilities; the failure of a public entity to meet that requirement constitutes discrimination under the ADA.[176] CATS has not claimed any exception for its failure to meet these standards based on structural impracticability under 28 C.F.R. § 36.401(c). Indeed, as set forth above, CATS has not offered any summary judgment evidence to demonstrate a genuine issue of disputed fact on this issue. Heybeck identified numerous bus stops along Route #8 that fail to meet these guidelines.[177] Over thirty bus stops along Route #8 were found to be inaccessible for various reasons, including failures to meet dimensional requirements, lack of boarding and alighting areas for mobility devices, and sidewalks and surface areas that are overgrown or in disrepair.[178] These conditions prevent individuals with disabilities from accessing and using the CATS bus system and, therefore. constitute discrimination under the ADA.  Plaintiffs are entitled to

---

[172] 28 C.F.R. § 35.151(c)(3).
[173] Rec. Doc. 64-1, p. 6.
[174] Rec. Doc. 64-12.
[175] Rec. Doc. 64-14.
[176] 28 C.F.R. § 36.401(a)(1).
[177] Rec. Doc. 64-11 p. 80-135.
[178] *Id.*

summary judgment on this claim.

### 3. Failure to Provide Reasonable Modifications

Plaintiffs' final argument is that CATS failed to provide Plaintiffs with a reasonable modification because it ignored Plaintiffs' requests.[179] It is uncontradicted that both Wright and Scurria sought reasonable modifications directly from CATS.  Wright attests that he sent a reasonable modification request to the City of Baton Rouge requesting that landing pads be installed in May of 2020, and he filled out a similar complaint on the CATS website in July of the same year.[180] Plaintiffs attach a copy of the second complaint.[181] Plaintiffs also submit another complaint made by Wright, wherein he reviewed and approved a similar request for reasonable modification to the City of Baton Rouge sent by his attorney, Andrew Bizer.[182] Wright maintains no one ever responded to any of these requests.[183]

The record evidence shows that Scurria notified CATS of the issues with the landing pads when he reviewed and approved a letter sent to Demnan (and copied CATS's attorney, Dedrick Moore) wherein it was explained that the bus stop system is inaccessible because most of the bus stops are non-compliant and modifications were requested.[184] Plaintiffs also cite the deposition of Thomas who received the request from Plaintiff Wright.[185]

CATS claims Plaintiffs' reasonable accommodations claims were rejected by this

---

[179] Rec. Doc. 64-1, p. 23.
[180] Rec. Doc. 64-3, p. 2.
[181] Rec. Doc. 64-5.
[182] Rec. Doc. 64-3, p. 3.
[183] *Id.*
[184] Rec. Doc. 64-7, p. 2; Rec. Doc. 64-9.
[185] Rec. Doc. 64-6, p. 10.

Court in ruling on the Defendants' *Motions to Dismiss*.[186]  In that *Ruling*, the Court stated:

> The Court notes that Plaintiff's claims for failure to accommodate are misplaced since he brings this action under Title II of the ADA: "the ADA's reasonable accommodation requirement does not apply under Title II"; rather, the "reasonable modification" requirement is applicable to public entities.
>
> **Nevertheless, the Court agrees with Plaintiff that CATS is not entitled to dismissal at this stage.**[187]

Contrary to CATS's claim, the Court denied CATS's motion in full.  It did not dismiss any of Plaintiff Wright's claims. And Plaintiffs corrected this issue in their *Second Amended Complaint*, articulating that they sought requests for "reasonable accommodation/modification."[188]  Plaintiffs cite to CATS's Reasonable Modification Policy.[189]  Again, the summary judgment evidence offered by Plaintiffs on this issue is uncontroverted and undisputed; CATS legal arguments fail to counter Plaintiffs' theories of liability under the ADA.  Accordingly, summary judgment is granted in favor of Plaintiffs on this claim.

After applying the law to the undisputed and uncontroverted facts and evidence offered by Plaintiffs, the Court finds that they have demonstrated that CATS has violated the ADA and the RA.  It is undisputed that Plaintiffs have qualifying disabilities; it is undisputed and uncontroverted that Plaintiffs have been and are being denied the benefits of services, programs or activities for which CATS is responsible, or have otherwise been discriminated against by CATS; and this discrimination is by reason of

---

[186] Rec. Doc. 76, p. 10 (citing Rec. Doc. 41).
[187] Rec. Doc. 41, p. 15 (quoting *Cleveland v. Gautreaux*, 198 F.Supp.3d 717, 736 (M.D. La. 2016))(emphasis added).
[188] Rec. Doc. 45.
[189] https://www.brcats.com/assets/docs/ADA/ReasonableModificationPolicy_2019.pdf (last accessed September 24, 2020).

their disabilities.[190]

### 4. Standing/Mootness

CATS's primary argument against liability in this case is its claim that the MovEBR program moots Plaintiffs' claims because this program purportedly will provide the remedy and relief Plaintiffs seek.  A case is moot when the issues presented are no longer "live," or the parties lack a legally cognizable interest in the outcome.[191] The Supreme Court has held that voluntary cessation of allegedly illegal conduct does not necessarily result in mootness, but jurisdiction may abate for mootness if: (1) it can be said with assurance that "there is no reasonable expectation . . ." that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.[192] CATS's argument for mootness fails on both of these requirements.

Plaintiffs can reasonably expect these violations to recur because neither CATS nor the MovEBR Project have implemented any ADA compliance measures beyond the designs and goals phase of the project. There has also been no interim relief or events that have completely eradicated the effects of the inaccessibility of the CATS bus system. Even if the Court had not excluded the undisclosed documents offered by CATS, CATS's own evidence and arguments demonstrate that the MovEBR Project became effective in April 2019 and will be funded through 2049.[193] While the MovEBR Project is ambitious, CATS's claim that every project undertaken by MovEBR will ensure full ADA compliance

---

[190] *See Miraglia v. Bd. of Supervisors of La. St. Museum*, 901 F.3d 565, 574 (5th Cir. 2018) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam)).
[191] *Powell v. McCormack*, 395 U.S. 486, 496 (1969).
[192] *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979).
[193] Rec. Doc. 76, p. 5; Rec. Doc. 77-3, p. 1.

is presumptuous considering its own purported evidence. The evidence, if considered, demonstrates aspiration at best. Offering that Plaintiffs' complaints will be addressed sometime within the next thirty years is insufficient to establish concrete relief to which Plaintiffs are entitled today.

In support of its mootness argument, CATS cites a message from Baton Rouge Mayor Sharon Weston-Broome,[194] a statement that includes ADA compliance as one of the acceptable goals for projects receiving funding but makes no specific commitments regarding accessibility.[195] CATS submits ADA Guidelines Module 6 to support the claim that ADA accessible, connected bus stops is one of the envisioned goals of the MovEBR project.[196] However, the Program Management Plan intended to show that the MovEBR Project has comprehensive structures, processes, and resources to meet these requirements and goals only refers to ADA guidelines once; the document shows that, as of April 2019, the Initial Workshop on ADA and mobility had yet to convene.[197] CATS's argument and evidence reveal that the MovEBR Project began before the institution of this action and has yet to produce a remedy for Plaintiffs.[198] Further, even the most concretely stated goals from the MovEBR planning documents are limited to prospective, generally stated goals with no particular plans of implementation or allocation of resources. Thus, Plaintiffs still have a stake in the outcome of this action because the effects of the alleged violations have not been completely addressed, and Plaintiffs have a reasonable expectation that these same violations will recur, possibly until 2049. CATS

---

[194] Rec. Doc. 76, p. 5.
[195] Rec. Doc. 77-11.
[196] Rec. Doc. 77-14, p. 4.
[197] Rec. Doc. 77-3, p. 38.
[198] Rec. Doc. 76, p. 1.

has not demonstrated that Plaintiffs lack standing or that their claims are moot.

In the Court's view, the facts of this case are somewhat similar to those in *Miraglia v. Bd. of Supervisors of La. St. Museum*.[199] In *Miraglia*, a quadriplegic afflicted with cerebral palsy who depended on a motorized wheelchair for movement, brought an action against the Board of Supervisors of the Louisiana State Museum ("Museum") and the Deputy Assistant Secretary, the official responsible for running the day-to-day operations of the Museum, alleging discrimination under Title II of the ADA and the RA by failing to rectify multiple architectural features that barred patron's entry to leased Museum shops; the plaintiff sought declaratory and injunctive relief and monetary damages. Ultimately, the district court concluded that Miraglia's request for declaratory and injunctive relief was rendered moot because the Museum had already undertaken efforts to remedy Miraglia's complaints as it produced evidence that it had purchased ramps, buzzers, and associated signage and intended to implement them.[200] By the time *Miraglia* was appealed to the Fifth Circuit, the Museum had already installed the signs and buzzers on the storefronts in order to provide access.[201]

In arguing against mootness, Miraglia asserted two arguments: (1) the Museum needed to be enjoined to ensure continued compliance, and (2) the Museum voluntarily ceased its behavior, which is an exception to mootness under the voluntary cessation doctrine.[202] The Fifth Circuit rejected both arguments, **finding that all requested relief had been implemented** and, as a government actor in its sovereign capacity, the

---

[199] *Miraglia v. Bd. of Supervisors of La. St. Museum*, 901 F.3d 565 (5th Cir. 2018).
[200] *Id.* at 571.
[201] *Id.*
[202] *Id.* at 572.

Museum was accorded a presumption of good faith rendering the voluntary cessation doctrine inapplicable.[203]

The actions taken by the Museum in *Miraglia* are easily distinguished from CATS's invocation of the MovEBR plan by the timeliness of the remedial actions. In *Miraglia*, there was no evidence in the record of the Museum's notice of the alleged violations prior to the institution of the action.[204] The Museum purchased materials to rectify the inaccessibility prior to the district court's bench trial and installed them before the Fifth Circuit heard their appeal.[205] In contrast, CATS was aware of the ADA violations prior to Plaintiffs' institution of this action.[206] CATS was also aware of the MovEBR Project as early as 2019 due to its position as a stakeholder in that project and its employees' involvement in that project.[207] However, CATS's first responsive pleading to the Court, a *Motion to Dismiss* Pursuant to FRCP Rule 12(b)(6) filed January 12, 2021, makes no mention of the MovEBR Project.[208] The City/Parish briefly raised MovEBR as a defense in its *Motion to Dismiss*,[209] and MovEBR was fully fleshed out as a defense of mootness with regard to the claims against the City/Parish in the parties' May 13, 2021 *Joint Status Report*.[210] However in that same report, CATS did not incorporate any arguments relating to MovEBR.[211] In its *Motion to Dismiss*, the City/Parish again relied on the MovEBR Project to disclaim liability,[212] however, the ruling granting its dismissal was based on

---

[203] *Id.* (emphasis added).
[204] *Id.* at 575.
[205] *Id.* at 571.
[206] Rec. Doc. 64-3, p. 2.
[207] Rec. Doc. 77-10, p. 1.
[208] Rec. Doc. 10; Rec. Doc. 10-1.
[209] Rec. Doc. 13-2, pp. 10-11.
[210] Rec. Doc. 32, p. 3.
[211] *Id.*
[212] Rec. Doc. 20-2, pp. 13-15.

issues of ownership, authority, and ADA compliance responsibility over the bus stops, not any defense of mootness.[213] Following this dismissal, Plaintiffs amended their complaint,[214] and CATS's *Answer* on November 18, 2021, filed well after new counsel enrolled for CATS, also did not refer to the MovEBR Project.[215] Accordingly, the Court rejects the argument that Plaintiffs' claims are moot or they now lack standing based on the MovEBR Program as there is nothing in the record to suggest that this program will address bus stop accessibility in the near future.

5. Necessity of the City/Parish in these proceedings

The City/Parish's *Motion to Dismiss* was filed on December 28, 2020.[216] This motion was fully briefed by February 1, 2021. On March 3, 2021, CATS filed a *Joint Motion to Substitute* Dedrick A. Moore ("Moore") in place of Creighton Abadie ("Abadie") as counsel of record.[217] That change of representation was granted on the very next day, March 4, 2021.[218] The Court ruled on the Defendants' *Motions to Dismiss* on July 29, 2021.[219] Thus, as of March 4, 2021, Moore had access to the docket sheet and access to the City/Parish's motion; yet, CATS never sought leave to file an opposition. Moore claims that Abadie refused to cooperate with him, and he has been unable to access case files, notes, or other work products from Abadie.[220] As a result, CATS claims it was unable to oppose the City/Parish's 12(b)(6) *Motion to Dismiss*.[221]

As explained above, in its *Ruling*, the Court determined that the City/Parish was

---

[213] Rec. Doc. 41, pp. 9-15.
[214] Rec. Doc. 45.
[215] Rec. Doc. 49.
[216] Rec. Doc. 20.
[217] Rec. Doc. 28.
[218] Rec. Doc. 29.
[219] Rec. Doc. 41.
[220] Rec. Doc. 76, pp. 10-11.
[221] *Id.*

not responsible as a matter of law for the ADA compliance of public transport bus stops and that CATS was the sole entity charged with that duty.[222] The Court reached this conclusion after considering the Operating Agreement between CATS and the City/Parish, CATS's representations to the Court, and the applicable Louisiana statutes.[223] The Operating Agreement states that the City/Parish "transfers any interest it may have in bus stop signs and shelters to [CATS]".[224] Both the City/Parish and CATS referred to the Capital Area Transit Act which provides that CATS shall have all powers necessary or convenient to construct, improve, maintain, repair, operate, and administer a mass transportation system and to contract with private parties to do the same.[225] Thus, whatever must be done to sidewalks or the underlying ground to make bus stops ADA compliant, CATS has "all power necessary" to perform. Despite the City/Parish's ownership of the sidewalks, it concedes that CATS has authority to perform whatever construction must be undertaken to make bus stops accessible even if that requires disturbing the underlying sidewalk or ground.  The *Ruling* dismissing the City/Parish provided that if Plaintiff failed to file an amended complaint within 21 days, dismissal of the City/Parish would be converted to dismissal with prejudice.[226] Plaintiffs filed an *Amended Complaint* wherein they proceeded only against CATS.[227]  By July 29, 2021, the date the *Ruling* was docketed, Moore had been enrolled on behalf of CATS for nearly six months, and Seth Dornier had been enrolled on behalf of CATS since July 2, 2021. CATS never filed a motion for reconsideration or relief from judgment or for impleader.

---

[222] Rec. Doc. 41, p. 13.
[223] *Id.*; Rec. Doc. 22-1, p. 5.
[224] Rec. Doc. 20-3, p. 4.
[225] La. Stat. Ann. § 48:1460.
[226] Rec. Doc. 41, p. 17.
[227] Rec. Doc. 45.

CATS now claims that the MovEBR Project will remedy Plaintiffs' complaints, rendering the present issue moot.[228] CATS also claims that its position as a 'stakeholder' in the MovEBR Project means that it has no decision-making authority.[229] Furthermore, CATS asserts that the requested compliance of the bus stop landing pads cannot be achieved without involvement by the City/Parish, making the City/Parish a necessary party to this matter.[230]

This argument was first presented to the Court, and rejected, when CATS filed a *Motion for Leave to File Complaint for Interpleader*.[231] In that *Motion*, CATS requested to join the City/Parish as a defendant due to the City/Parish's ownership of the immovable property underneath the bus stops and due to the City/Parish's control of the MovEBR Project.[232] The Magistrate Judge interpreted the *Motion* to be a request for impleader under Rule 14 rather than interpleader under Rule 22 due to the City/Parish's dismissal with prejudice and the lack of any allegation of multiple or duplicative liability on the part of CATS.[233] The Court determined the motion was untimely because the City/Parish had been dismissed from the action on July 29, 2021, and the deadline for CATS to join additional parties expired on August 23, 2021.[234] The Court further held that if CATS sought modification of the Court's deadlines to name a new party, that relief should be denied for failure to demonstrate good cause under Rule 16(b)(4) of the Federal Rules of Civil Procedure.[235]

---

[228] Rec. Doc. 76, pp. 6-9.
[229] Rec. Doc. 76, p. 6.
[230] Rec. Doc. 76, p. 9.
[231] Rec. Doc. 83.
[232] *Id.* at p. 1.
[233] Rec. Doc. 85, p. 4.
[234] Rec. Doc. 85, p. 4-5.
[235] Rec. Doc. 85, p. 5.

CATS argues that the City/Parish's ownership of the immovable property and rights-of-way and the City/Parish's control of the MovEBR Project preclude CATS's compliance with an adverse summary judgment ruling.[236] CATS appears to assert this argument solely in support of their mootness defense; the *Memorandum in Opposition* to Plaintiff's *Motion for Summary Judgment* does not mention Rule 16(b)(4) or good cause to change scheduling deadlines.[237] CATS's explanation of the problems in dealing with prior counsel and transferring caseloads could be interpreted as an argument for good cause to change scheduling deadlines, but CATS does not explicitly make such a request.

Rule 16(b)(3)(A) provides that the court's "scheduling order must limit the time to join other parties, amend the pleadings, complete discovery, and file motions." The *Scheduling Order* for this case set the deadline to add new parties for August 23, 2021.[238] Rule 16(b)(4) allows for a schedule to be modified only for good cause and with the judge's consent. The "good cause" standard focuses on the diligence of the party seeking modification, and the movant cannot rely on their "mere inadvertence and the absence of prejudice to the nonmovant.[239]   Rather, the movant must show that, despite their diligence, they could not reasonably have met the scheduling deadline.[240] The Court assesses four factors when deciding whether to modify a scheduling order under Rule 16(b)(4): "(1) the explanation for the failure to timely [file the motion]; (2) the importance of the [motion]; (3) potential prejudice in allowing the [motion]; and (4) the availability of a continuance to cure such prejudice."[241]

---

[236] Rec. Doc. 76, pp. 8-9.
[237] Rec. Doc. 76.
[238] Rec. Doc. 33, p. 1.
[239] *Architettura, Inc. v. DSGN Assocs. Inc.*, No. 3:16-CV-3021-D, 2017 WL 3311197, at *2 (N.D. Tex. Aug. 3, 2017).
[240] *S&W Enterprises, L.L.C. v. SouthTrust Bank of Alabama*, NA, 315 F.3d 533, 535 (5th Cir. 2003).
[241] *Architettura,* 2017 WL 3311197, at *3.

Courts usually deny a motion to modify a scheduling order "[w]hen a party files an untimely motion ... and does not address the good cause standard under Rule 16(b)(4).[242] However, some courts have made exceptions where the grounds on which a movant relies are made relatively clear.[243] Arguably, the grounds on which CATS relies are relatively clear.[244] CATS recounts the timing of the substitution of counsel and alleges that Abadie refused to communicate with current counsel, and current counsel had no access to case file, notes, thoughts, or impressions from former counsel on this matter.[245] CATS also cites a backlog of cases and filings prevented their progress at this time.[246] On July 2, 2021, Dornier was enrolled as co-counsel for CATS.[247] Dornier assisted with producing discovery responses, but CATS alleges that the new executive staff was unable to provide the necessary information and knowledge in time for CATS to respond to the City/Parish's 12(b)(6) motion.[248]

Nevertheless, CATS fails to satisfy the Rule 16(b)(4) standard for good cause, which requires showing of diligence by the moving party, and even if the conduct of Abadie is not imputed to CATS, CATS's current counsel have not demonstrated their diligence. Moore was enrolled in March of 2021 and was, or should have been, aware of the scheduling deadlines set for this case. CATS employees have been aware of their position as a stakeholder in the MovEBR Project and the balance of authority between CATS and the City/Parish since 2019.[249] Therefore, the claim by CATS that "no one within

---

[242] *Id.* (citing *Wachovia Bank, Nat'l Ass'n v. Schlegel*, 2010 WL 2671316, at *3 (N.D. Tex. June 30, 2010)).
[243] *See e.g., Nieves v. John Bean Techs. Corp.*, 2014 WL 2587577, at *2 (N.D. Tex. June 10, 2014).
[244] Rec. Doc. 76, pp. 10-11.
[245] Rec. Doc. 76, p. 11.
[246] *Id.*
[247] Rec. Doc. 40.
[248] Rec. Doc. 76, p. 11.
[249] Rec. Doc. 77-10.

the agency possessed the knowledge or information to assist in these endeavors"[250] must be rejected because CATS's new counsel did have access to information in the possession of the client, such as knowledge of the MovEBR Project prior to and during the course of this action. Further, the Operating Agreement was in the agency's possession, and the appliable law and the Court record was readily available to new counsel. CATS's failure to raise the MovEBR Project as a defense to the City/Parish's 12(b)(6) motion and/or to join the City/Parish as a new party can be attributed to current counsels' own oversight.

## V.   CONCLUSION

For the reasons set forth above, Plaintiffs' *Motion for Summary Judgment*[251] is GRANTED as to liability and to Plaintiffs' entitlement to injunctive relief. However, the Court orders the Plaintiffs and CATS to meet and confer in good faith and submit a joint proposed Judgment establishing injunctive relief on or before January 18, 2023. If the parties are unable to reach an agreement by that time, the Court will take further action.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 9th day of December, 2022.

_____
**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[250] Rec. Doc. 76, p. 11.
[251] Rec. Doc. 64.